NO ORAL ARGUMENT SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 22-5300
(C.A. No. 19-3192)

———————————————

JASON LEOPOLD, *et al.*,                                                        Appellants,

v.

DEPARTMENT OF JUSTICE,                                                       Appellee.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

**BRIEF FOR APPELLEE**

———————————————

MATTHEW M. GRAVES
United States Attorney

BRIAN P. HUDAK
JANE M. LYONS
Assistant United States Attorneys

DOUGLAS C. DREIER
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530
Douglas.Dreier@usdoj.gov
(202) 252-2551

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Appellee files this certificate as to parties, rulings, and related cases.

### Parties and *Amici*

Appellants are Jason Leopold and Buzzfeed, Inc., who were the plaintiffs in the District Court. Appellee is the United States Department of Justice, which was the defendant in the District Court.

There were no *amici* or intervenors in the District Court, and there have been no *amici* or intervenors in this Court to date.

### Rulings Under Review

At issue in this appeal are the Honorable Rudolph Contreras's January 13, 2021, Memorandum Opinion and Order, denying the parties' respective motions for summary judgment, and September 19, 2022, Memorandum Opinion and Order, granting defendant's renewed motion for summary judgment and denying plaintiffs' cross-motion for summary judgment.

### Related Cases

This case has not previously been before this Court. Undersigned counsel is not currently aware of any pending related cases.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..............................................................1

STATEMENT OF THE ISSUES.................................................................1

PERTINENT STATUTE ...........................................................................2

COUNTERSTATEMENT OF THE CASE.....................................................3

   I.  THE UNDERLYING MONITOR REPORT ....................................4

   II. THE FOIA REQUEST ..............................................................6

SUMMARY OF ARGUMENT ...................................................................7

STANDARD OF REVIEW .......................................................................8

ARGUMENT .......................................................................................8

   I.  THE AGENCY REASONABLY FORESEES THAT RELEASE OF ANY PORTION OF THE MONITOR REPORT WILL RESULT IN SEVERE HARM..............................................................................................8

     A.  Exemption 8 Indisputably Applies to the Monitor Report. .......................8

     B.  The Agency Provided Detailed Descriptions of the Foreseeable Harm That Disclosure Would Cause.................................................................11

       1.  Disclosure Harms the Prosecution of Other Financial Institutions. .....12

       2.  Disclosure Impairs Banking Regulators' Ability to Carry out Their Responsibilities to Supervise Banking Organizations.................................15

       3.  Disclosure Threatens the Security of HSBC and Other Financial Institutions..........................................................................................17

       4.  The Agency Reasonably Foresees Harm from Disclosure of Any Portion of the Monitor Report. .................................................................21

II. THE DISTRICT COURT ACTED COMFORTABLY WITHIN ITS DISCRETION BY DECLINING TO CONDUCT *IN CAMERA* REVIEW OF THE LENGTHY RECORD AT ISSUE. ............................................................26

CONCLUSION ........................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Abrams v. Dep't of Treasury*,
   243 F. App'x 4 (5th Cir. 2007) (per curiam)......................................................... 26

*Bartko v. Dep't of Just.*,
   898 F.3d 51 (D.C. Cir. 2018) ............................................................................. 26

*Carney v. Dep't of Just.*,
   19 F.3d 807 (2d Cir. 1994) ................................................................................ 14

*CIA v. Sims*,
   471 U.S. 159 (1985) .......................................................................................... 18

\* *Consumers Union of U.S., Inc. v. Heimann*,
   589 F.2d 531 (D.C. Cir. 1978) .................................................. 3, 9, 16, 18, 26

*Croysdale v. Franklin Sav. Ass'n*,
   601 F.2d 1340 (7th Cir. 1979) ........................................................................... 15

*Ctr. for Nat'l Sec. Studs. v. Dep't of Just.*,
   331 F.3d 918 (D.C. Cir. 2003) ........................................................................... 18

*DiBacco v. Dep't of Army*,
   926 F.3d 827 (D.C. Cir. 2019) ..................................................................... 13-14

*Friedman v. Sebelius*,
   686 F.3d 813 (D.C. Cir. 2012) ......................................................................... 10

\* *Gregory v. FDIC*,
   631 F.2d 896 (D.C. Cir. 1980) (per curiam) ................... 3, 9, 18, 19, 21, 22, 26

*Hayden v. NSA*,
   608 F.2d 1381 (D.C. Cir. 1979) ....................................................................... 27

*In re Subpoena Served upon Comptroller of Currency*,
   967 F.2d 630 (D.C. Cir. 1992) .................................................................... 16, 17

*Johnson v. Exec. Off. for U.S. Att'ys*,
   310 F.3d 771 (D.C. Cir. 2002) ........................................................................... 8

*Juarez v. Dep't of Just.*,
   518 F.3d 54 (D.C. Cir. 2008) ....................................................................... 8, 27

*Jud. Watch, Inc. v. Dep't of Just.*,
    616 F. Supp. 3d 13 (D.D.C. 2022) .................................................... 27

*Kassman v. Am. Univ.*,
    546 F.2d 1029 (D.C. Cir. 1976) (per curiam) ............................ 19, 25

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ...................................................... 27

*Loving v. Dep't of Def.*,
    550 F.3d 32 (D.C. Cir. 2008) ........................................................ 27

*Machado Amadis v. Dep't of State*,
    971 F.3d 364 (D.C. Cir. 2020) ...................................................... 25

*Mead Data Ctr., Inc. v. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ................................................. 22, 23

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ................................................................. 10, 11

*Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
    57 F.4th 1061 (D.C. Cir. 2023) ................................................ 22, 24

*Pub. Citizen v. Farm Cred. Admin.*,
    938 F.2d 290 (D.C. Cir. 1991) (per curiam) ........................... 25-26

*Pub. Invs. Arb. Bar Ass'n v. SEC*,
    771 F.3d 1 (D.C. Cir. 2014) ................................................. 3, 9, 25

*Quiñon v. FBI*,
    86 F.3d 1222 (D.C. Cir. 1996) ...................................................... 26

*Reps. Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) .................................................. 11, 13

*United States v. HSBC Bank USA, N.A.*,
    863 F.3d 125 (2d Cir. 2017) .................................................... 5, 6, 7

*United States v. Hubbard*,
    650 F.2d 293 (D.C. Cir. 1980) ...................................................... 24

*United States v. Moore*,
    824 F.3d 620 (7th Cir. 2016) ........................................................ 15

iv

*United States v. Slatten*,
   865 F.3d 767 (D.C. Cir. 2017) ..................................................... 14-15

*Weissman v. CIA*,
   565 F.2d 692 (D.C. Cir. 1977) ........................................................ 27

**Statutes**

5 U.S.C. § 552 ................................................... 1, 2, 3, 8, 9, 11, 24, 26

15 U.S.C. § 78q........................................................................ 26

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

31 U.S.C. § 5318 ......................................................................... 4

50 U.S.C. App. § 3 ....................................................................... 4

50 U.S.C. App. § 5 ....................................................................... 4

50 U.S.C. § 1702 ......................................................................... 4

50 U.S.C. § 1705 ......................................................................... 4

**Rules**

Fed. R. Evid. 807 ...................................................................... 14

**Other Materials**

*In re HSBC Holdings plc*,
   No. 12-062-B-FB, 2012 WL 12338649 (Fed. Rsrv. Dec. 11, 2012) ................. 5

H.R. Rep. No. 1497, 89th Cong., 2d Sess. (1966),
   *as reprinted in* 1966 U.S.C.C.A.N. 2418 ........................................ 18

S. Rep. No. 114-4 (2016),
   *as reprinted in* 2016 U.S.C.C.A.N. 321 ......................................3, 21

# GLOSSARY

| | |
|---|---|
| Agency | Executive Office for United States Attorneys |
| Aplt. Br. | Brief for the Appellant |
| Federal Reserve | Federal Reserve Board |
| FOIA | Freedom of Information Act |
| HSBC | HSBC Holdings plc. and Subsidiaries |
| JA[#] | Joint Appendix |
| Monitor | Monitor Michael Cherkasky |
| Monitor Report | First Annual Follow-Up Review Report and Appendices |
| UK Regulator | United Kingdom's Financial Conduct Authority |

## STATEMENT OF JURISDICTION

Plaintiffs invoked the District Court's jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. JA09. The District Court granted summary judgment to the government on September 19, 2022. JA128–52. A timely notice of appeal was filed on November 17, 2022. JA153.

This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Exemption 8 of the Freedom of Information Act ("FOIA") protects from disclosure matters related to reports prepared for financial regulatory agencies. This case concerns a Monitor Report prepared for, among others, the Federal Reserve Board to evaluate a financial institution's compliance with certain laws. There is no dispute that the entire Monitor Report is covered by Exemption 8. The questions presented are:

I.      Whether the district court properly upheld the government's conclusion that it could "reasonably foresee[ ] that disclosure" of the Monitor Report "would harm an interest protected by" Exemption 8, *see* 5 U.S.C. § 552(a)(8).

II.     Whether the District Court acted within its discretion when it declined to conduct *in camera* review.

1

## **PERTINENT STATUTE**

**5 U.S.C. § 552(a)(8)(A)(i)(I)–(II):**

(a)(8)(A) An agency shall—

    (i) withhold information under this section only if—

        (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

        (II) disclosure is prohibited by law[.]

*    *    *

**5 U.S.C. § 552(b)(8):**

(b) This section does not apply to matters that are—

*    *    *

    (8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions[.]

## <u>COUNTERSTATEMENT OF THE CASE</u>

FOIA Exemption 8 shields from disclosure information "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions."  5 U.S.C. § 552(b)(8).  "[T]his court has explained time and again that Exemption 8's scope is 'particularly broad.'"  *Pub. Invs. Arb. Bar Ass'n v. SEC*, 771 F.3d 1, 4 (D.C. Cir. 2014) (quoting *Consumers Union of U.S., Inc. v. Heimann*, 589 F.2d 531, 533 (D.C. Cir. 1978)).  In enacting Exemption 8, "Congress looked to the nature and source of the material and determined to provide absolute protection."  *Gregory v. FDIC*, 631 F.2d 896, 898 (D.C. Cir. 1980) (per curiam).  And when passing the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, which introduced the foreseeable-harm requirement, Congress confirmed that Exemption 8 continues to afford "absolute protection" to records shielded by Exemption 8 and that Congress had no intention of compromising the important interests protected thereby.  S. Rep. No. 114-4 (2016), *as reprinted in* 2016 U.S.C.C.A.N. 321, 330 ("This legislation is not intended to lessen the protection under Exemption 8 created by Congress and traditionally afforded by the courts.").  This appeal concerns a record that is indisputably covered by Exemption 8—i.e., the Monitor Report.  Aplt. Br. at 3.

## I.     THE UNDERLYING MONITOR REPORT

In December 2012, the U.S. Attorney's Office for the Eastern District of New York and the Money Laundering and Asset Recovery Section of the Department of Justice's Criminal Division filed a criminal information charging HSBC with violations of the Bank Secrecy Act—namely, that HSBC willfully failed to (1) maintain an effective anti-money laundering program in violation of 31 U.S.C. § 5318(h) and (2) conduct and maintain adequate due diligence on correspondent bank accounts held on behalf of foreign entities in violation of 31 U.S.C. § 5318(i). JA065–66 (¶ 12).  The criminal information also charged HSBC Holdings plc. with willfully facilitating financial transactions on behalf of sanctioned entities in violation of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1702 and 1705, and the Trading with the Enemy Act, 50 U.S.C. App. §§ 3, 5, and 16.  *Id.*

Together with the criminal information, the government filed a deferred prosecution agreement between it and HSBC, a statement of facts, a corporate compliance monitor agreement, and a letter requesting that the United States District Court for the Eastern District of New York place the HSBC prosecution in abeyance for sixty months pursuant to the terms of the deferred prosecution agreement.  JA066 (¶ 13).  HSBC also entered into a resolution with the UK Regulator and Federal Reserve, which were parties to regulatory actions undertaken against HSBC for the same underlying conduct.  JA066–67 (¶ 14); *see also* JA074.

In connection with the deferred prosecution agreement, the Department of Justice and the UK Regulator required the appointment of an independent monitor to evaluate HSBC's controls, policies, and procedures related to its compliance with anti-money laundering and sanctions laws, and remedial measures identified in the deferred prosecution agreement. JA066–67 (¶ 14). The Monitor was required to submit reports on HSBC's progress. *Id.*; *see also* JA024 (¶ 2). The Federal Reserve also approved the Monitor's selection as an independent consultant pursuant to an administrative consent order to cease and desist between HSBC and the Federal Reserve, *In re HSBC Holdings plc*, No. 12-062-B-FB, 2012 WL 12338649 (Fed. Rsrv. Dec. 11, 2012). *See* JA042 (¶ 2); JA046.

In January 2015, the Monitor issued the Monitor Report and provided it to HSBC, the Department of Justice, the UK Regulator, and the Federal Reserve. JA067 (¶ 15). In June 2015, the U.S. District Court for the Eastern District of New York ordered the government to file the Monitor Report, which it initially placed under seal pursuant to requests by the government and HSBC. *Id.*

A third party moved the district court to unseal the Monitor Report. JA025 (¶ 4). Initially, the district court ordered that portions of the Monitor Report be unsealed; however, the U.S. Court of Appeals for the Second Circuit reversed, concluding that the district court erred in ordering that any part of the Monitor Report be unsealed. *Id.*; *see also United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 129

(2d Cir. 2017).  The Second Circuit concluded that the Monitor Report was not a judicial document, and it noted the government's "confidentiality considerations and concerns that public disclosure of the Monitor's Report would undermine the effectiveness of the Monitor and serve as a road map for criminals who wished to exploit vulnerabilities in HSBC's compliance regime." *HSBC*, 863 F.3d at 132, 139. The Second Circuit "offer[ed] no view on whether any of FOIA's exemptions would apply" if the document were requested under FOIA.  *Id.* at 142 n.7.  The Monitor Report remains under seal today.  JA025 (¶ 4); *see also* Monitor Report, *United States v. HSBC Bank USA, N.A.*, Crim. A. No. 12-0763 (E.D.N.Y. June 1, 2015), ECF Nos. 36, 37.

## II.    THE FOIA REQUEST

On August 5, 2019, the Agency received a FOIA request from Jason Leopold, then a Senior Investigative Reporter with BuzzFeed News.  JA014–15 (¶¶ 1, 4); JA012.  The request sought the "1,000-page" Monitor Report.  JA012.  The Agency located the Monitor Report and determined that it was not subject to release pursuant to FOIA Exemptions 4, 6, 7(A), 7(C), 7(D), and 8.  JA015 (¶ 5).

Plaintiffs initiated this action on October 24, 2019.  JA002.  The parties filed two rounds of summary judgment briefing.  JA004–08.  The District Court initially found that Exemptions 4 and 8 apply to the Monitor Report but requested additional briefing regarding segregability.  JA083.  After further briefing, the District Court

granted summary judgment to the Department of Justice.  JA128.  Because the District Court found that "Exemption 8 suffices to allow the government to withhold the [Monitor] Report in full," it did not ultimately determine whether Exemption 4 or any other exemptions also applied.[1]  JA152.  The District Court declined to conduct *in camera* review because the "numerous affidavits" that the government provided are "not contradicted anywhere in the record," "there is no indication that the government has acted in bad faith," and Plaintiffs did "not challenge the government's assertion that the requisite line-by-line review was conducted."  *Id.*

This appeal followed.

## **SUMMARY OF ARGUMENT**

The parties agree that the entire report is covered by Exemption 8.  Aplt. Br. at 3. The question for the Court is whether the Agency adequately substantiated that it could "reasonably foresee[ ]" that disclosure of any portion of the Monitor Report "would harm an interest protected by" Exemption 8.  Exemption 8 was designed to allow frank communications between financial institutions and their regulators, frankness which can be assured only through a guarantee of confidentiality.  The Monitor Report at issue in this case was made possible by multinational cooperation in which the guarantee of confidentiality was crucial, and the government

---

[1]    Were the Court to reverse, it should follow its typical course of remanding for further proceedings regarding the applicability of each of the FOIA exemptions that apply to the Monitor Report.

documented with declarations the harms that would ensue if those promises of confidentiality were broken. Specifically: (1) disclosure would harm the prosecution of other financial institutions; (2) disclosure would seriously impair the Federal Reserve's ability to carry out its responsibility to supervise banking organizations; and (3) disclosure of the Monitor Report threatens the security of HSBC and other financial institutions as they attempt to thwart crime.

Accordingly, the Court should affirm the judgment of the District Court.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary judgment. *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 774 (D.C. Cir. 2002). The Court reviews a district court's decision whether to conduct *in camera* review of FOIA documents for abuse of discretion. *Juarez v. Dep't of Just.*, 518 F.3d 54, 60 (D.C. Cir. 2008).

## ARGUMENT

## I. THE AGENCY REASONABLY FORESEES THAT RELEASE OF ANY PORTION OF THE MONITOR REPORT WILL RESULT IN SEVERE HARM.

### A. Exemption 8 Indisputably Applies to the Monitor Report.

Exemption 8 protects matters that are "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C.

8

§ 552(b)(8). "Congress enacted Exemption 8 to address the 'concern[ ] that release of bank examination and operating reports could endanger the fiscal well-being of [ ] subject banks.'" *Pub. Invs.*, 771 F.3d at 5 (alterations in original) (quoting *Consumers Union*, 589 F.2d at 537). "[T]his court has explained time and again that Exemption 8's scope is 'particularly broad.'" *Id.* at 4 (quoting *Consumers Union*, 589 F.2d at 533); *see also Gregory*, 631 F.2d at 898 ("We held . . . that the meaning of exemption 8 was clear and that its broad, all-inclusive scope should be applied as written since Congress had 'intentionally and unambiguously' so contemplated. . . . Congress had left no room for a narrower interpretation in its choice of statutory language.") (quoting *Consumers Union*, 589 F.2d at 535).

Plaintiffs concede that Exemption 8 applies to the Monitor Report. *See* Aplt. Br. at 3 ("Appellants do not dispute that Exemption 8 covers the report or that disclosing some of it would cause foreseeable harm."). It is beyond dispute that the Monitor Report was "prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552(b)(8). And Exemption 8's coverage extends to every part of the report. Exemption 8 does not merely protect examination, operating, or condition reports themselves, but rather any record "related to" such reports. 5 U.S.C. § 552(b)(8); *see also Consumers Union*, 589 F.2d at 532 (holding that Exemption 8 "protects from disclosure documents relating to the extent of compliance by . . . banks with

9

. . . the Truth in Lending Act"). "The key phrase in this provision is 'relating to,' the 'ordinary meaning of [which] is a broad one—"to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with."'" *Friedman v. Sebelius*, 686 F.3d 813, 820 (D.C. Cir. 2012) (alteration in original) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)). Indeed, Plaintiffs do not urge that only certain segregable portions of the Monitor Report are subject to Exemption 8. Aplt. Br. at 3.

The Monitor Report "extensively documents the Monitor's findings and assessment of HSBC's anti-money laundering and sanctions compliance program around the world," detailing the Monitor's "(i) analysis of [HSBC's] enhancements to its [anti-money laundering] and sanctions compliance program; (ii) phased reviews of HSBC's operations and implementation of that program within certain countries; (iii) thematic reviews of HSBC's [anti-money laundering] and sanctions compliance program within its trade finance and private banking businesses; and (iv) assessment of other HSBC remediation efforts and program enhancements." JA113 (¶ 8). "The entire purpose of the [Monitor] Report was to comprehensively assess and make recommendations for improving HSBC's [anti-money laundering] and sanctions compliance program—two areas of acute concern to financial regulators such as the [Federal Reserve] and the Office of the Comptroller of Currency[.]" JA114–15 (¶ 13). This "is the very reason the Monitor performed his

work as reflected in the [Monitor] Report simultaneously on behalf of the [Department of Justice], the [Federal Reserve], and [the UK Regulator]." *Id.* "There is no portion of the [Monitor] Report that does not further or relate to the Monitor's purpose of comprehensively assessing HSBC's [anti-money laundering] and sanctions compliance program, or to Congress's purpose of encouraging financial institutions like HSBC from engaging in open and candid discussions regarding such matters of high relevance to financial regulators with supervisory authority." JA115–16 (¶ 15). Accordingly, Exemption 8 applies to the Monitor Report in its entirety.

### B. The Agency Provided Detailed Descriptions of the Foreseeable Harm That Disclosure Would Cause.

The question on appeal is whether the Agency properly determined that it could "reasonably foresee[ ] that disclosure would harm an interest" protected by Exemption 8. 5 U.S.C. § 552(a)(8)(A)(i)(I). The Agency's detailed descriptions of the potential for significant harm went far beyond "speculative or abstract fears" or "generalized assertions." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021). As demonstrated below, the Agency "articulate[d] both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Id.* (quotation marks omitted).

11

1.    **Disclosure Harms the Prosecution of Other Financial Institutions.**

First, disclosure would harm the prosecution of other financial institutions. JA068 (¶ 19); JA114, 118–19 (¶¶ 10, 24).  "The processes that make monitorships of [financial institutions] pursuant to criminal [deferred prosecution agreements] successful, and in fact, the very existence of such monitorships, could be threatened if [financial institutions] and their regulators in the United States and abroad believe that monitors' reports might be publicly disclosed."    JA068 (¶ 19).    Such prosecutions require significant coordination between the financial institution at hand, U.S.-based regulators, and foreign regulators.  *See* JA069 (¶ 20) ("In other words, when U.S. and foreign regulators consider allowing their constituent [financial institutions] to share information with future monitors, they may refuse if they believe that the information will be made public.").

In this case, for instance, Malaysia's Central Bank "had previously granted approval for the Monitor's access to confidential information of [certain HSBC subsidiaries] and their customers, based on the assurance given to [Malaysia's Central Bank] that any information gathered by the Monitor" "would be treated with utmost confidentiality, consistent with the confidentiality provisions in [Malaysian] legislation."    JA059.    Malaysia's Central Bank cooperated in this global investigation based on assurances that this information "would only be disclosed to [the Department of Justice], the Federal Reserve Board and [the UK Regulator]."

12

*Id.* The same applies to other foreign regulators. *See* JA058 ("[The Hong Kong Monetary Authority] consider[s] it important to bring to your attention the practical difficulties that publication of the report, in full or part, may present to the future work of the Monitor by inadvertently limiting the extent to which whistle blowers and staff will come forward and candidly communicate with the Monitor."). The "voiding of promises of confidentiality made to several foreign regulators" would cause "significant" harm to the ability of these global regulators to continue to work together. JA111 (¶ 3); *see also* JA047; JA053 (¶ 20); JA118–19 (¶ 24) ("Public release of even a redacted version of the [Monitor] Report would violate these assurances of confidentiality and result in substantial negative ramifications for US law enforcement.").

Plaintiffs objected below to any consideration of unsworn letters from foreign regulators. The District Court refused to consider these letters in granting summary judgment to the Agency, JA096, and the harms articulated by the Agency are fully supported by the sworn testimony that the Agency submitted. *See, e.g.*, JA067–68 (¶¶ 16, 19); JA114, 118–19 (¶¶ 10, 24).

In any event, the letters are appropriate evidence of foreseeable harm because, in part, the Court permits hearsay to be considered in FOIA litigation. *See, e.g.*, *DiBacco v. Dep't of Army*, 926 F.3d 827, 833 (D.C. Cir. 2019) ("[A]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed

to satisfy Rule [56(c)]; there is no need for the agency to supply affidavits from each individual who participated in the actual search.") (quoting *Carney v. Dep't of Just.*, 19 F.3d 807, 814 (2d Cir. 1994)).

The letters also fall within the residual exception to hearsay.  *See* Fed. R. Evid. 807 (allowing hearsay statement if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts").  There are significant practical difficulties in asking foreign governments to file a document under penalty of perjury, and the fact that foreign government officials submitted letters to the U.S. District Court for the Eastern District of New York at all is a testament to the importance they placed on keeping the Monitor Report under seal.  Indeed, given the special circumstances here (including that the Agency provided admissible testimony confirming that release of the Monitor Report would result in "the voiding of promises of confidentiality made to several foreign regulators," JA111 (¶ 3); *see also* JA43 (¶ 9); JA118 (¶ 24)), the residual exception would apply to these letters submitted by foreign regulators even if hearsay were impermissible in FOIA litigation.  *See United States v. Slatten*, 865 F.3d 767, 808 (D.C. Cir. 2017) (holding that the residual exception applied, considering that the surrounding circumstances

14

"indicate [the speaker's] reliability and manifest that he was likely telling the truth at the time he made his statements"); *United States v. Moore*, 824 F.3d 620, 624 (7th Cir. 2016) (holding that the residual exception covers Iraqi intelligence documents, especially given that there were other circumstantial guarantees of truthfulness as to the relevant representations in the documents).  Accordingly, whether the Court disregards the letters from the foreign regulators (like the District Court did), whether it considers the letters because hearsay is permitted in FOIA litigation, or whether it considers the letters because the residual exception applies, the result is the same: the Agency has provided adequate support to demonstrate that it reasonably foresees that disclosure would harm an interest protected by Exemption 8.

## 2. Disclosure Impairs Banking Regulators' Ability to Carry out Their Responsibilities to Supervise Banking Organizations.

Second, the Agency reasonably foresees that disclosure would impair banking regulators' ability to carry out their responsibilities to supervise banking organizations.  JA068–69 (¶ 20); JA118–19 (¶ 24).  Banking regulation is a "very complex field." *Croysdale v. Franklin Sav. Ass'n*, 601 F.2d 1340, 1344 n.4 (7th Cir. 1979).  In light of the complex nature of banking regulation and the important financial ramifications that a misstep may have on the national economy, Congress adopted Exemption 8 "to ensure the security of financial institutions" and to reduce

the "concern that banks would [otherwise] cooperate less than fully with federal authorities." *Consumers Union*, 589 F.2d at 534.

As this Court has recognized, "[t]he success of [banking regulators'] supervision . . . depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency." *In re Subpoena Served upon Comptroller of Currency*, 967 F.2d 630, 633 (D.C. Cir. 1992). "Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank." *Id.* at 634. "These conditions simply could not be met as well if communications between the bank and its regulators were not privileged." *Id.*

Here, "HSBC personnel may become less forthcoming and proactive with [the Monitor] in all of his roles if they believe that the information they provide to him is likely to become public through disclosure of the Monitor Report. This lack of candor could affect the quality of the [Monitor's] reviews of . . . compliance efforts, as staff would be less forthcoming regarding potential shortcomings of those efforts." JA046. "Open and candid communications between examiners and regulated organizations are critical to the effectiveness of the Federal Reserve's ongoing supervision program. In fact, the bank examination privilege—which protects the confidentiality of certain deliberative information—exists to preserve the relationship between examiners and regulated organizations so that this type of

16

communication will take place." JA047 (citing *In re Subpoena*, 967 F.2d at 633–34); *see also* JA111 (¶ 3) ("Disclosure of any portion of the [Monitor] Report" "would improperly disclose the kind of financial and other sensitive information that HSBC's and other financial institutions' regulators who exercise daily supervisory responsibility rightly expect to remain confidential."). Accordingly, the Agency reasonably foresees that disclosure of the Monitor Report would cause the very harm that Congress sought to prevent by enacting Exemption 8.

### 3. Disclosure Threatens the Security of HSBC and Other Financial Institutions.

Third, disclosure of the Monitor Report threatens the security of HSBC and other financial institutions as they attempt to thwart crime. JA068 (¶ 19); JA110–11, 114 (¶¶ 2–3, 12). The Monitor Report "provide[s] a roadmap for criminals to exploit vulnerabilities in HSBC's compliance program." JA111 (¶ 3). "The entire purpose of the [Monitor] Report was to comprehensively assess and make recommendations for improving HSBC's [anti-money laundering] and sanctions compliance program." JA114–15 (¶ 13). Revealing those vulnerabilities will identify ways for criminals seeking to launder funds or circumvent Office of Foreign Assets Control sanctions programs to do so more effectively. JA114 (¶ 12). Even for those vulnerabilities that HSBC has now rectified, criminals could take what they learn from the Monitor Report and use that knowledge against other financial institutions that suffer from the same vulnerabilities. *Id.*; *see also* JA053–54 (¶¶ 19–24). And

17

even those pieces of information that may seem harmless in themselves may pose a security risk. *See Ctr. for Nat'l Sec. Studs. v. Dep't of Just.*, 331 F.3d 918, 928–29 (D.C. Cir. 2003) ("[T]he Supreme Court caution[s] that 'bits and pieces' of data 'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'  Thus, '[w]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.'") (citation and quotation marks omitted) (quoting *CIA v. Sims*, 471 U.S. 159, 178 (1985)).

The odious consequences of disclosure of the Monitor Report are precisely why Congress enacted Exemption 8 in the first place. *See Consumers Union*, 589 F.2d at 534 n.10 ("[T]he House Report explains that exemption 8: 'is designed to insure the security and integrity of financial institutions, for the sensitive details collected by Government agencies which regulate these institutions could, if indiscriminately disclosed, cause great harm.'") (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2418, 2428).  Not only would disclosure "undermine public confidence and cause unwarranted runs on banks," but also "[i]f details of the bank examinations were made freely available to the public and to banking competitors, there was concern that banks would cooperate less than fully with federal authorities." *Id.* at 534; *see also Gregory*, 631 F.2d at 898 ("It is clear from the legislative history that the exemption was drawn to protect not

simply each individual bank but the integrity of financial institutions as an industry.").  "In view of these practical exigencies, frank cooperation between bank officials and [regulators] is needed."  *Gregory*, 631 F.2d at 899.  Accordingly, disclosure of the Monitor Report would cause clear harm not just to HSBC, not just to the Department of Justice, not just to the Federal Reserve, but to the integrity of the entire industry.  *See id.* at 898.

Plaintiffs object that the Naftalis Declaration (JA110–19)—which is just one of the affidavits confirming that this harm would ensue, *see, e.g.*, JA068–69 (¶¶ 19, 21) (Moeser)—is too speculative because Mr. Naftalis claims no personal knowledge of other financial institutions' compliance programs.  Aplt. Br. at 30.  Plaintiffs did not assert this argument in the District Court, and it is waived.  *Kassman v. Am. Univ.*, 546 F.2d 1029, 1032 (D.C. Cir. 1976) (per curiam) ("Litigative theories not pursued in the trial court ordinarily will not be entertained in an appellate tribunal.").  Had Plaintiffs raised this argument below, the Agency would have responded by noting that Mr. Naftalis, the New York Deputy Office Managing Partner of Latham & Watkins LLP, who previously served as Global Co-Chair of the law firm's White Collar Defense & Investigations Practice, and who previously was an Assistant U.S. Attorney in the Southern District of New York where he was a member of the Securities and Commodities Fraud Task Force, has significant experience in this very area.  Latham & Watkins LLP, *Benjamin A.*

*Naftalis*, https://www.lw.com/en/people/benjamin-naftalis (last accessed July 21, 2023).

    In any event, Deputy Chief Moeser's affidavit further supports the fact that release of the Monitor Report threatens the security of HSBC and other financial institutions as they attempt to thwart money laundering and other financial crimes. *See, e.g.*, JA064 (¶ 9) ("Any disclosure containing the [M]onitor's frank assessment of the [financial institution] or sensitive information about its operations could undermine the [financial institution's] security and that of the financial system. Moreover, if such information were to leak or be disclosed in some other fashion, the relationship between the [financial institution] and the [M]onitor—the crux of a successful monitorship—would be jeopardized."); JA065 (¶ 11) ("The release of sensitive information deemed confidential by the Department and the [financial institution] during a [deferred prosecution agreement's] pendency, such as monitor's reports, would be harmful even after the conclusion of a [deferred prosecution agreement]. . . . [S]uch an unfiltered recitation of the [financial institution's] affairs, albeit historic, could undermine its current security by undermining public confidence in the [financial institution] or the financial system."); JA067 (¶ 16) (confirming that the letters submitted by foreign regulators, e.g., JA057–58 and JA059–60, "demonstrate some of the reasons why the Monitor's reports should be kept confidential").

**4.    The Agency Reasonably Foresees Harm from
Disclosure of Any Portion of the Monitor Report.**

The Agency thoroughly examined whether any portion of the Monitor Report could be disclosed and concluded that the Monitor Report must be withheld in full. "[A]ttorneys at the [U.S. Attorney's Office for the Eastern District of New York] and the Money Laundering and Asset Recovery Section of the United States Department of Justice [ ] conducted a line-by-line review of every page of the [Monitor] Report," and "[b]ased on this review, [they] concluded that there is no meaningful, non-exempt information in the [Monitor] Report that can be reasonably segregated and released."  JA106–07 (¶ 2).  Plaintiffs have not challenged that the requisite line-by-line review was conducted.  JA152.

Given the importance of the interests protected by Exemption 8, Congress provided that Exemption 8 would have a "broad, all-inclusive scope."  *Gregory*, 631 F.2d at 898.  The legislative history surrounding the FOIA amendments that introduced the foreseeable-harm requirement makes clear that Congress had no intention of compromising those important interests.  S. Rep. No. 114-4 (2016), *as reprinted in* 2016 U.S.C.C.A.N. 321, 329–30 (footnotes omitted).  The Senate Report observed that "Exemption 8 was intended by Congress, and has been interpreted by the courts, to be very broadly construed to ensure the security of financial institutions and to safeguard the relationship between the banks and their supervising agencies."  *Id.* The Senate Report cites to this Court's decision in

21

*Gregory* to note that this Court has "gone so far as to state that in Exemption 8 Congress has provided 'absolute protection regardless of the circumstances underlying the regulatory agency's receipt or preparation of examination, operating or condition reports.'" *Id.* (quoting *Gregory*, 631 F.2d at 898). The Senate Report makes clear that the FOIA amendments were "not intended to lessen the protection under Exemption 8 created by Congress and traditionally afforded by the courts." *Id.*

Plaintiffs insist that trivial portions of the report, such as its table of contents, could be disclosed without risking the harms foreseen by the Agency. But under FOIA, an agency "need not disclose a redacted version of [a record] if the unredacted markings would 'have minimal or no information content.'" *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1069 (D.C. Cir. 2023) (quoting *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977)). Because the informative portions of the report were properly withheld, no disclosure was required. *See id.* In addition, any promise of confidentiality is much more meaningful if it is absolute; the promise that the report will remain confidential in its entirety is much more likely to generate the intended frank communication that Exemption 8 protects than an expectation that agencies and courts will comb through the report to find portions that might be disclosed. *See, e.g.*, JA044 (¶ 10); JA064 (¶ 10); JA068–69 (¶ 20); JA111 (¶ 3); JA118–19 (¶ 24).

In response, Plaintiffs primarily urge that, because two individuals with knowledge of the Monitor Report—the Monitor and a district court judge— purportedly would have supported partial disclosure, the District Court should have agreed with them.  These arguments collapse under scrutiny.

First, the Monitor did not support partial disclosure of the Monitor Report. JA043–44 (¶¶ 7–13).  To the contrary, although he averred that he is "a strong supporter of the interest of the public in transparency in government" and has "no interest in keeping the status of HSBC Group's compliance with the [deferred prosecution agreement] from public view," he supported the Department of Justice's request to file the Monitor Report under seal, as "confidentiality under these circumstances is in the best interests of an effective monitorship."  JA043 (¶ 7).  "For example, in one Asian jurisdiction the issue of confidentiality was a continual source of discussion, and [the Monitor's] in-person assurance to those regulators that their countrymen's information would be reviewed in confidence—and the results shared only with the [government]—was crucial to being allowed to see unredacted files." JA043 (¶ 9).  "In one European country, we were told that if review of confidential materials were not restricted to the [government], that country's regulator would limit our access to those materials."  *Id.*  While the Monitor expressed his belief that "a redacted report that does not negatively impact the Monitor's work can be produced," he warned that "[s]uch a redacted report might lack the factual support

23

that gives it its critical context and meaning." JA044 (¶ 13); *see also Perioperative*, 57 F.4th at 1069 (holding that an agency "need not disclose a redacted version of [a record] if the unredacted markings would 'have minimal or no information content'").

Second, the district court judge that ordered the public filing of a redacted Monitor Report—which order was reversed on appeal—did not conclude that no harm could reasonably be foreseen to arise if portions of the Monitor Report were released. Instead, he relied on the presumption in favor of disclosure of judicial records, which "vindicate[s] 'this country's common law tradition of public access to records of a judicial proceeding.'" *Perioperative*, 57 F.4th at 1066 (quoting *United States v. Hubbard*, 650 F.2d 293, 314 (D.C. Cir. 1980)). There is no similar presumption in favor of disclosure of records that are subject to a FOIA exemption; to the contrary, if an agency "reasonably foresees" that harm will result from disclosure, the record is properly withheld. 5 U.S.C. § 552(a)(8)(A)(i)(I). The only time a court has applied that standard to the Monitor Report was in the decision under review here, which properly upheld the withholding. JA148–52.

Plaintiffs further urge that, because a parade of horribles purportedly did not occur when that district court judge appeared to quote two sentences of the Monitor Report, further disclosure should occur. Again, the question of whether an agency can "reasonably foresee[ ]" that harm would result from disclosure is not the same

as the question of whether demonstrated harm occurred in every instance where there was any disclosure of the relevant material.  *See Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020).

Plaintiffs also urge that, because the Department of Justice publicly characterized certain facts that may also be contained in the Monitor Report, the Monitor Report itself must also be disclosed.  As demonstrated by the fact that the entire subsection on this issue in Plaintiffs' opening brief cites no evidence from the District Court record, Aplt. Br. at 43–44, Plaintiffs did not raise this argument below, and it is waived.  *Kassman*, 546 F.2d at 1032 ("Litigative theories not pursued in the trial court ordinarily will not be entertained in an appellate tribunal.").  Even if Plaintiffs would have raised this argument, there are material differences between disclosing portions of a Monitor Report that foreign regulators expect to be kept under seal and preparing an entirely separate document contemporaneously that is fit for public disclosure after it has been thoroughly vetted.  The Agency reasonably foresees that disclosing any portion of the Monitor Report would cause significant and severe harm.  *See, e.g.*, JA023 (¶ 26); JA026–27 (¶ 8); JA043 (¶ 7); JA068–69 (¶¶ 18–21); JA108 (¶ 7); JA111 (¶ 3).

As a result of the "absolute protection" afforded by Exemption 8, this Court has affirmed the withholding in full of reports protected by Exemption 8 every time the issue has come to the Court.  *See, e.g.*, *Pub. Invs.*, 771 F.3d at 3, 8; *Pub. Citizen*

*v. Farm Cred. Admin.*, 938 F.2d 290, 293–94 (D.C. Cir. 1991) (per curiam); *Gregory*, 631 F.2d at 899 n.6; *Consumers Union*, 589 F.2d at 535; *see also Bartko v. Dep't of Just.*, 898 F.3d 51, 74 (D.C. Cir. 2018) ("[T]here is no reason for us to exercise our discretion to reach the [forfeited] question [regarding the applicability of Exemption 8 to two withheld documents] given that both withheld documents— a report of an examination of a broker-dealer, pursuant to 15 U.S.C. § 78q(b), and a letter relating to that report—fall within Exemption 8's heartland."); *Abrams v. Dep't of Treasury*, 243 F. App'x 4, 7 (5th Cir. 2007) (per curiam) ("Similarly, Abrams argues that the district court should have required that the [Office of the Comptroller of the Currency] redact any confidential information and disclose the remaining, non-exempt Orders.  Under exemption 8, however, the *entire* Order is rendered confidential.") (emphasis in original).  Accordingly, the District Court appropriately determined that the entire Monitor Report should be withheld.

## II.  THE DISTRICT COURT ACTED COMFORTABLY WITHIN ITS DISCRETION BY DECLINING TO CONDUCT *IN CAMERA* REVIEW OF THE LENGTHY RECORD AT ISSUE.

The decision of whether to conduct *in camera* review of withheld records is "committed to the broad discretion of the trial court judge." *Quiñon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (quotation marks omitted); *see also* 5 U.S.C. § 552(a)(4)(B).  A district court need not and should not "resort[ ]" to *in camera* review "as a matter of course." *Quiñon*, 86 F.3d at 1228. While FOIA authorizes

courts to review records *in camera*, "it by no means compels the exercise of that option." *Juarez*, 518 F.3d at 59–60. Courts have "'broad discretion' to decide whether *in camera* review is necessary to determine whether the government has met its burden." *Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008). The Court will consider the length of the document when considering whether *in camera* review is appropriate; for instance, where there is "minimal length [to] the documents involved," a district court might "not have abused its discretion had it chosen to review the documents *in camera*." *Juarez*, 518 F.3d at 60.

As this Court has explained, "[t]he reluctance of Congress and the Courts to require *in camera* inspection is well founded." *Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977). "*In camera* inspections are burdensome and are conducted without the benefit of an adversary proceeding." *Id.* Further, "there is a cost to every *in camera* review": "[t]here is always a risk that information could be disclosed— intentionally or unintentionally—by someone or by some process involved," and "other would-be leakers may be incrementally more comfortable disclosing information whenever there are incrementally more potential sources of the leaks." *Jud. Watch, Inc. v. Dep't of Just.*, 616 F. Supp. 3d 13, 25 n.7 (D.D.C. 2022). Thus, "[w]hen the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate." *Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009) (quoting *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

Here, the District Court acted comfortably within its discretion when it declined to conduct *in camera* review of the lengthy record at issue.  For all the reasons stated above, the Agency met its burden by means of the many affidavits it submitted.  Therefore, *in camera* review was neither necessary nor appropriate, and the District Court did not abuse its discretion here.

## **CONCLUSION**

Appellee respectfully requests that the Court affirm.

> MATTHEW M. GRAVES
> United States Attorney
>
> BRIAN P. HUDAK
> JANE M. LYONS
> Assistant United States Attorneys
>
> */s/ Douglas C. Dreier*
> DOUGLAS C. DREIER
> Assistant United States Attorneys
> 601 D Street, N.W.
> Washington, D.C.  20530
> (202) 252-2551
> douglas.dreier@usdoj.gov
>
> *Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify on this 21st day of July, 2023, the foregoing Brief has been served by the Court's CM/ECF system.

/s/ Douglas C. Dreier
DOUGLAS C. DREIER
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,350 words, excluding the parts of the brief exempted under Rule 32(f) and D.C. Cir. Rule 32(e), according to the count of Microsoft Word.

/s/ Douglas C. Dreier
DOUGLAS C. DREIER
Assistant United States Attorney